FILED IN MY OFFICE
DISTRICT COURT CLERK
6/30/2015 2:45:34 PM
STEPHEN T. PACHECO
Veronica Rivera

STATE OF NEW MEXICO
COUNTY OF RIO ARRIBA
FIRST JUDICIAL DISTRICT

EMILIO RANDALL and
STELLA RANDALL,

    Plaintiffs,

v.

                                D-117-CV-2015-00241
                                No. ~~D-117-CV-~~_____

CITY OF ESPAÑOLA; SOLOMON
ROMERO; GREG ESPARZA;
RICHARD TRUJILLO; DUSTIN
CHAVEZ; and ERIC GARCIA,

    Defendants.

## COMPLAINT FOR DAMAGES
## UNDER THE NEW MEXICO TORT CLAIMS ACT

       Plaintiffs Emilio Randall and Stella Randall, by and through their attorneys, Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Bienvenu LLP, bring this complaint for damages against Defendants pursuant to the New Mexico Tort Claims Act, NMSA 1978, § 41-4-1 to -30.

### PARTIES

       1.     Plaintiffs Emilio Randall and Stella Randall are residents of Española, New Mexico.

       2.     Defendant City of Española (the "City") is an incorporated municipality, a body politic, and a municipal corporation under the laws of the State of New Mexico. It also is a governmental entity and local public body as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978, § 41-4-3(B)-(C). As such, it may sue or be sued in its name. It has the authority to employ police officers, and to delegate to the Española Department of Public Safety/Police Department ("EPD") and the EPD Director/Chief, final policy and decision-

**EXHIBIT A**

making authority over law enforcement matters. EPD is a division or a department of the City, which the City controls and operates. The City is responsible for the actions of its employees and agents. At all times material hereto, the City was the employer of the individually-named Defendants and is responsible for the actions of its employees and agents, including the individually-named Defendants, under the doctrine of *respondeat superior* and other forms of vicarious liability.

3. Defendant Solomon Romero ("Defendant Romero") is a former EPD law enforcement officer. On information and belief, at all times material hereto, Defendant Romero has been a resident of Rio Arriba County, New Mexico and was employed by EPD and the City. At all times material hereto, Romero was a law enforcement officer and public employee as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978, § 41-4-3(D) and (F)(2), and was acting in the course and scope of his duties and employment. Defendant Romero has had a long history of misconduct while employed as a law enforcement officer and abruptly resigned from the EPD in 2015 while under investigation for embezzlement.

4. Defendant Greg Esparza ("Defendant Esparza") is an EPD law enforcement officer. On information and belief, at all times material hereto, Defendant Esparza has been a resident of Rio Arriba County, New Mexico and has been employed by EPD and the City. At all times material hereto, Defendant Esparza was a law enforcement officer and public employee as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978, § 41-4-3(D) and (F)(2), and was acting in the course and scope of his duties and employment.

5. Defendant Richard Trujillo ("Defendant Trujillo") is an EPD law enforcement officer. On information and belief, at all times material hereto, Defendant Trujillo has been a resident of Rio Arriba County, New Mexico and has been employed by EPD and the City. At all

times material hereto, Defendant Trujillo was a law enforcement officer and public employee as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978, § 41-4-3(D) and (F)(2), and was acting in the course and scope of his duties and employment.

6. Defendant Dustin Chavez ("Defendant Chavez") is an EPD law enforcement officer. On information and belief, at all times material hereto, Defendant Chavez has been a resident of Rio Arriba County, New Mexico and has been employed by EPD and the City. At all times material hereto, Defendant Chavez was a law enforcement officer and public employee as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978, § 41-4-3(D) and (F)(2), and was acting in the course and scope of his duties and employment.

7. From December 2012 to June 2014, Defendant Eric Garcia ("Defendant Garcia") was the Director/Chief of EPD. On information and belief, at all times material hereto, Defendant Garcia has been a resident of Rio Arriba County, New Mexico and was employed by EPD and the City. At all times material hereto, Defendant Garcia was a law enforcement officer and public employee as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978, § 41-4-3(D) and (F)(2), and was acting in the course and scope of his duties and employment. At all times material hereto, Defendant Garcia was the supervisor of the other individually-named Defendants and was responsible for the hiring, training and supervision of subordinate law enforcement officers of the EPD. At all times material hereto, Defendant Garcia was the final decision-maker and policy-maker for the City of Española in regard to law enforcement matters.

**JURISDICTION AND VENUE**

8. The Court has original jurisdiction over Plaintiffs' claims brought under the New Mexico Tort Claims Act pursuant to NMSA 1978, § 41-4-18(A).

9. Venue for Plaintiffs' Tort Claims Act claims is proper in this district pursuant to NMSA 1978, § 41-4-18(B).

10. All of the acts complained of herein which constitute the basis for liability on the claims brought pursuant to the New Mexico Tort Claims Act come within the scope of the waivers of immunity contained therein.

11. Plaintiffs have given written notice of the claims contained herein pursuant to the New Mexico Tort Claims Act in compliance with the requirements therein, NMSA 1978 § 41-4-16.

## FACTS RELEVANT TO ALL CAUSES OF ACTION

12. The preceding paragraphs are incorporated as if fully stated herein.

13. Emilio Randall was born on July 16, 1942 and is 72 years old.

14. Stella Randall was born on September 14, 1946 and is 68 years old.

15. Emilio and Stella met while in college and were married in 1966. In 1971 they moved to Española, New Mexico, where Mrs. Randall was raised.

16. Mr. and Mrs. Randall spent their working lives as teachers in the public schools. Mr. Randall taught mathematics at the Española High School, while Mrs. Randall taught Health, English, and Special Education.

17. Mr. Randall retired in 1994. Since then he has managed his ranch properties in Española and in the nearby mountains. He is also an accomplished blacksmith. Mrs. Randall retired in 2014 after close to forty years with the public schools.

18. Both Mr. and Mrs. Randall are well-known and well-respected members of their community. They have been very active in the schools and in a number of community organizations. They are devout Catholics and active in their local parish church in Santa Cruz; in

addition, Mrs. Randall serves as "Mayordomo" (manager and caretaker) of the Chapel Santo Niño.

19. Mr. and Mrs. Randall have a daughter, Ana, who is 47 years old and employed as an accountant with the Eight Northern Indian Pueblos Council. They have two grandsons, Ronnie and Nico. They also had a much-loved son, Lucas Randall, until his untimely death on July 17, 2013.

20. Lucas Randall was born on February 2, 1982. After graduating from Española High School in 2000, he worked in finance and sales at car dealerships in Albuquerque, Santa Fe and Española. After living in Albuquerque and Santa Fe he returned to Española and lived in a mobile home on the Randalls' ranch property not far from the Randalls' residence. He frequently came to his parents' residence to visit. Mr. Randall regularly visited Lucas on his daily trips to the ranch to feed his livestock.

21. Unfortunately, Lucas succumbed for unknown reasons to the epidemic of opiate addiction that has swept over northern New Mexico and across the United States in recent years. One day in March 2012, Lucas was found unconscious in the mobile home by his sister. She called her father Emilio, who came immediately to the scene. They called 911. Paramedics arrived shortly thereafter and revived Lucas from an apparent overdose.

22. Also dispatched to the scene was Defendant Romero. Even though he was only on the scene in response to a medical emergency, Defendant Romero took the opportunity to search the interior of the mobile home for evidence of stolen goods. He found nothing stolen, even though he ran the identification numbers of some of the property.

23. In 2013, Lucas was required to serve thirty days in jail for a probation violation. He was released on July 16, 2013. Mrs. Randall was there to bring him home.

24.     The next morning, July 17, 2013, Mr. and Mrs. Randall visited Lucas at the mobile home.  Mr. and Mrs. Randall then left and returned to their own residence.

25.     The Randalls made several telephone calls to Lucas later in the morning.  None of the calls were answered.  Mr. Randall decided to drive to the ranch to check on Lucas.  He knocked on the door of the mobile home and yelled Lucas's name but there was no answer.  He then entered the mobile home and found Lucas unconscious on the kitchen floor.  He immediately called 911.  He then called his wife and told her to come to the ranch right away.

26.     The 911 dispatcher issued a dispatch for an "Ocean David," meaning an overdose. Defendants Chavez and Trujillo responded to the call and arrived separately at the address shortly thereafter.  Mr. Randall assisted them in finding the residence from the highway and explained what he had found.

27.     Defendants Chavez and Trujillo conducted a "sweep" of the residence to ensure it was safe for medical personnel and observed this was an obvious overdose case.  Medical personnel arrived on scene shortly thereafter and began resuscitative efforts on Lucas.

28.     Mrs. Randall drove as fast as she could to the ranch.  When she arrived there were already two police cars and the EMT vehicle in the driveway.  She parked her car near the mobile home and Mr. Randall stood next to her.  Mr. Randall introduced her to Defendant Chavez, who had been his student.  Defendant Chavez told them that the medics were working on Lucas, and it was best for the Randalls to stay outside and let them do their job.  The Randalls stayed by Mrs. Randall's car.

29.     At that point, even though there were already two police officers on the scene and there was nothing more to be done other than for the medics to attempt to resuscitate Lucas, additional police officers began to arrive, including Defendant Esparza, EPD Detective George

Martinez, and Defendant Romero.

30. Mr. Randall recognized Defendant Romero as the same officer who had responded to the previous medical emergency in 2012 and who had looked through the home for stolen property. Mr. Randall told Defendant Romero, in Spanish, that he did not want him searching through the house without a warrant.

31. Defendant Romero responded angrily, telling Mr. Randall: "You don't tell me what to do; I tell you what to do." He then walked past the Randalls and entered the Randalls' mobile home.

32. The medics were continuing to work on Lucas inside. Defendant Romero looked around the interior and then went back outside. When he came back out he asked Mr. Randall if the house was in his name. He then said that he was going to get a search warrant and if there was anything illegal inside he was going to arrest Mr. Randall. Mr. Randall replied simply that Defendant Romero should do what he had to do.

33. Defendant Esparza, who had been standing nearby, then approached Mr. Randall and ordered him to get in his wife's vehicle. There was no lawful basis for this order as Mr. Randall was on his own property, the vehicle was not his, he was not in anyone's way, and he was simply standing by with his wife waiting to hear what had happened to their son.

34. Mr. Randall asked why he was being ordered into the car and Defendant Esparza falsely claimed that it was because it was a "crime scene." Mr. and Mrs. Randall were surprised and confused as all they knew was that 911 had been called for a medical emergency. They both asked Defendant Esparza what he meant when he said it was a crime scene.

35. Defendant Esparza responded to this question by informing Mr. Randall that he was under arrest. No grounds were given for the arrest, and in fact there were none because no

crime had been committed nor did Defendant Esparza have probable cause to believe a crime had been committed.  Mr. Randall was entitled to stand by his wife on his own property while waiting for word of his son's condition, was not in any way interfering with any of the officers in the performance of any of their lawful duties, was acting peacefully and non-provocatively, and had every right to ask what Defendant Esparza meant by calling this medical call a "crime scene."

      36.     Defendant Esparza then physically restrained Mr. Randall and began to place him in handcuffs.

      37.     Defendant Romero, who had come over to where Defendant Esparza and the Randalls were standing, then grabbed Mr. Randall and attempted to make his own arrest of Mr. Randall.  Defendant Romero had no grounds for making an arrest of Mr. Randall or for assisting Defendant Esparza's unlawful arrest of Mr. Randall.

      38.     Defendant Romero then shouted "Tase him! Tase him!"  Tasers are electro-shock weapons that shoot wired darts into the body to disrupt the nervous system with 50,000 volts of electricity.  Defendant Romero had no justification for the use of any force, let alone for increasing the level of force to such an extreme and potentially deadly level on an unarmed 71-year-old man who was surrounded by five police officers on his own property, and who had committed no crime.

      39.     Defendants Chavez and Trujillo both attempted to employ their Tasers based on Defendant Romero's shouted command.  Defendant Chavez was too inexperienced to be able to unholster his Taser.  Defendant Trujillo, however, immediately deployed his Taser and shot Mr. Randall in the stomach at least once and possibly two times.  The high voltage electric shock surged through Mr. Randall for many seconds, causing extreme pain and suffering.

8

40. Defendant Esparza also engaged his Taser and shot Mr. Randall, subjecting Mr. Randall to additional excruciating pain.

41. At the end of this physical assault Mr. Randall lay face first on the ground, helpless, in severe pain, and barely conscious.

42. Defendants continued their assault on Mr. Randall as he lay helpless and in shock on the ground. They forced his arms behind his back and locked his wrists together with handcuffs. One or more of the Defendants kicked Mr. Randall repeatedly as he lay in the dirt, cracking one of his ribs. As Mr. Randall was being kicked, one of the Defendants cursed him and said, "You're just like your son."

43. Mrs. Randall pleaded with the Defendants to calm down and stop their assault on Mr. Randall. Defendant Esparza responded by informing Mrs. Randall that she was also under arrest.

44. Defendant Esparza then grabbed Mrs. Randall, forced her arms behind her back and locked handcuffs around her wrists. The handcuffs were very tight and caused Mrs. Randall, who has arthritis, great pain.

45. Defendant Esparza forced Mrs. Randall, still handcuffed, into the back of his vehicle and closed her in.

46. The Defendants picked Mr. Randall up off the ground and made him stand in the hot sun without any medical attention. He asked for water but Defendant Esparza refused to give him water or anything to drink. Defendant Esparza then stood nearby and drank a cold drink in the shade while they waited for a transport van.

47. Mr. and Mrs. Randall watched the Defendants lounge and joke in the front yard. None of the Defendants checked on the Randalls' well-being or provided them with any

9

information regarding Lucas's condition.

48. Eventually a transport van arrived and the Defendants forced Mrs. Randall out of the vehicle and into the van, still handcuffed. They then forced Mr. Randall into the back of the van, still handcuffed. Mr. and Mrs. Randall attempted to console one another even though they were separated by a barrier inside the van.

49. The medical investigator arrived on the scene and went inside. Eventually he came back out and approached the Randalls and asked them where they wanted the body taken. The Randalls asked if Lucas was dead and the medical investigator said yes. It was at that moment that the Randalls were first informed that their son Lucas had died.

50. The medical investigator held out his card to Mr. Randall, but he could not take it because his hands were hand-cuffed behind his back. The medical examiner reached into the van and put the card in Mr. Randall's shirt pocket and left.

51. The Randalls were then transported across town to the Española jail. They never were given the opportunity to see their son, were not able to bless his body, and never had the chance to say goodbye.

52. The Randalls were handcuffed behind their backs in the transport van and did not have seatbelts. The driver drove fast and recklessly, knocking them about in the transport van and causing them to experience additional pain, discomfort and anxiety.

53. When they arrived at the jail, the officer in charge, who knew the Randalls as important members of the community, expressed his shock to see them. Mrs. Randall was booked and processed, including having a mug shot taken. She was then put into a holding cell.

54. Mr. Randall was refused entry due to his elevated heart rate following the tasing and battery by the EPD officers. He was put back into a vehicle and transported to the Española

Hospital.

55. Medical personnel at the Española Hospital confirmed that Mr. Randall was suffering from atrial fibrillation (i.e., elevated and abnormal heart rhythm) as well as fractured ribs from being kicked by the Defendants. He remained at the hospital for two hours, then was taken back again to the Española jail.

56. From the Española jail, Mr. Randall was driven to the Santa Fe jail, some 45 minutes away. However, the Santa Fe jail performed an EKG and also refused to admit him, due to continuing atrial fibrillation. Mr. Randall was then transported to the emergency room at St. Vincent Hospital in Santa Fe where he was admitted for treatment and observation.

57. Mrs. Randall was not able to bond out from the Española jail until late that night. She was required to post $2,500 bond and was finally released. She had no idea where her husband had been taken or what condition he was in. She and her family members made many phone calls to try to locate him and finally learned that he was at the hospital in Santa Fe. They arrived there late that night.

58. Mr. Randall was discharged from the hospital on July 18, 2013. Because Mr. Randall was in so much pain and because his condition was so uncertain, the Randalls made the decision to proceed immediately with Lucas' funeral. They were afraid that if they waited any longer, Mr. Randall might not survive to properly lay his son to rest. They devoted themselves to the preparations and the service was held two days later.

59. Mrs. Randall went to Valley First Care medical clinic on July 19, 2013 due to the bruising and pain in her hands, wrists and shoulder from being improperly hand-cuffed during the course of her false arrest, and the anxiety and distress associated with the ordeal. The nurse was alarmed by her examination of Mrs. Randall and made a report to the authorities that Mrs.

11

Randall had been physically abused. Mrs. Randall has continued to suffer from weakness and numbness in both hands and wrists, in addition to weakness, dizziness, anxiety and stress as a direct consequence of the Defendants' actions.

60. Defendant Esparza filed a false charge of resisting arrest/obstructing an officer against Mrs. Randall in Magistrate Court.

61. Defendant Romero filed false charges of disorderly conduct, aggravated battery on a police officer, and resisting arrest against Mr. Randall in District Court.

62. In addition, Defendant Romero went to the local newspaper, the Rio Grande Sun, and made false statements that were printed in the newspaper maligning Mr. Randall.

63. The Randalls had to borrow money to hire attorneys to defend them against the false criminal charges.

64. After reviewing the facts, the District Attorney dismissed the charges brought by Defendant Romero against Mr. Randall.

65. The District Attorney also declined to pursue the charge brought by Defendant Esparza against Mrs. Randall. Defendant Esparza, however, continued to prosecute the charge himself. Defendant Esparza dismissed the charges he filed in Magistrate Court and then re-filed the charges in Municipal Court in Española in order to obtain the services of the City Attorney to assist him.

66. Mrs. Randall was forced to go to trial to defend herself. The trial was held on April 17, 2014. Defendants Romero, Esparza, Trujillo and Chavez gave false testimony at the trial in an effort to cause Mrs. Randall to be falsely convicted of a crime she did not commit. After hearing testimony from the Randalls, the Defendants, and the neighbor who witnessed the entire affair, the judge dismissed the charges, finding that there was no probable cause for them.

67. As a direct and proximate result of the above-described conduct of Defendants, Mr. Randall and Mrs. Randall were injured and have suffered and continue to suffer damages, including but not limited to physical pain and suffering, bodily injury, physical injury, emotional distress, psychological fear, anguish, loss of enjoyment of life, embarrassment, humiliation, reputational damage, medical expenses, legal expenses, deprivation of constitutional rights and other consequential, incidental and special damages.

68. In January 2015, the EPD opened an internal affairs investigation into misconduct by Defendant Romero including criminal activity and violations of departmental policy. Defendant Romero was placed on administrative leave.

69. On or about February 10, 2015, Defendant Romero abruptly resigned from the EPD while the internal investigation was ongoing.

70. On February 18, 2015, Defendant Romero was formally charged by the District Attorney with the crime of embezzlement.

71. On February 20, 2015, the EPD's internal investigation found that Defendant Romero misappropriated ammunition belonging to the EPD, exchanged EPD ammunition for shirts which he converted to his own personal use, and ordered shirts for the EPD which were never paid for and which he re-sold, retaining the profits for his own personal gain.

72. The EPD's internal investigation also found that Defendant Garcia, while serving as Director/Chief of the EPD, violated City of Española policies and the New Mexico procurement code in the exchange of ammunition by Defendant Romero.

**FIRST CAUSE OF ACTION**
**(Claims Against Defendants Romero, Esparza,**
**Trujillo and Chavez Under the New Mexico Tort Claims Act)**

73. The preceding paragraphs are incorporated as if fully stated herein.

74. Defendants Romero, Esparza, Trujillo and Chavez, as law enforcement officers, had the duty in any activity actually undertaken by them to exercise, for the safety of others, a level of care that would be ordinarily exercised by a reasonable, prudent, and qualified law enforcement officer in light of the nature of the circumstances at the time.

75. Defendants breached their duties by failing to follow appropriate procedures, by unnecessarily creating a dangerous situation that would not otherwise have existed and thereby precipitating the unnecessary and unreasonable use of force, by using unreasonable, unnecessary, unjustified, excessive, and deadly force against the Randalls, by retaliating against the Randalls for the exercise of their lawful rights, by arresting the Randalls without probable cause, by pursuing false criminal charges against the Randalls, and by making false and defamatory statements about the Randalls.  By their acts and omissions as set forth herein, Defendants caused personal injury and/or bodily injury to the Randalls resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, and/or deprivation of rights, privileges, or immunities secured by the constitutions and laws of the State of New Mexico.

76. The actions and inactions of the Defendants were direct and proximate causes of the injuries and damages to the Randalls as set forth herein.

**SECOND CAUSE OF ACTION**
**(Claims Against Defendants Garcia and**
**City of Española Under the New Mexico Tort Claims Act)**

77. The preceding paragraphs are incorporated as if fully stated herein.

78. As Director/Chief of the EPD, Defendant Garcia had a duty to properly screen, hire, train, monitor, supervise and/or discipline subordinate employees, agents, and contractors as part of his duties.

79. Defendant Garcia breached his duties by failing to properly screen, hire, train, monitor, supervise and/or discipline subordinate EPD law enforcement officers, including Defendants Romero, Esparza, Trujillo and Chavez. Defendant Garcia further breached his duties by failing to adopt or enforce appropriate policies, procedures and protocols and by otherwise failing to take appropriate and reasonable supervisory actions to prevent the harm caused to the Randalls. Defendant Garcia's conduct caused personal injury and/or bodily injury to the Randalls resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, and/or deprivation of rights, privileges, or immunities secured by the constitutions and laws of the State of New Mexico.

80. The City was the governmental entity that had immediate supervisory responsibility over the actions of the employees of EPD, including the individually named Defendants. The City had a duty to properly screen, hire, train, monitor and/or supervise employees and agents of EPD to ensure that they did not act unlawfully. Supervision includes the obligation to adopt and inculcate reasonable and proper policies and procedures concerning employee training, adequate monitoring and regulation of employee activity, and other such policies and procedures as are reasonably necessary to prevent the harms complained of herein. The City breached its duties by failing to properly screen, hire, train, monitor and/or supervise the individually-named Defendants, thereby causing harm to the Randalls as set forth herein.

81. The actions and inactions of the City and Defendant Garcia were direct and proximate causes of the injuries and damages to the Randalls as set forth herein.

82. The City is jointly and severally liable for all injuries or damages caused by its employees and agents, including the individually-named Defendants, under the doctrine of *respondeat superior* and other forms of vicarious liability.

WHEREFORE, Plaintiffs request the following relief against Defendants:

A. An award of compensatory damages, jointly and severally, as set forth above and any other consequential, incidental, and special damages, under any or all of the causes of action, in an amount to be determined at the trial of this case

B. An award of pre- and post-judgment interest on any amounts recovered herein;

C. Their costs of action herein; and

D. Such other and further relief as the Court may deem appropriate under the circumstances.

### REQUEST FOR JURY TRIAL

Plaintiffs hereby request a trial by a six-person jury on all claims above-listed, pursuant to Rule 1-038 NMRA.

Respectfully submitted,

ROTHSTEIN, DONATELLI, HUGHES,
DAHLSTROM, SCHOENBURG & BIENVENU LLP

*/s/ John C. Bienvenu*
John C. Bienvenu
Mark H. Donatelli
Jocelyn Barrett
1215 Paseo de Peralta
Post Office Box 8180
Santa Fe, New Mexico 87504-8180
(505) 988-8004

*Attorneys for Plaintiffs*